Council, we're ready for you. Good morning, Your Honors. May it please the Court, my name is Mary Schultz and I am the attorney for the appellant here, Susan Jones, in this case against US Bank. This is an appeal from the dismissal of an employment discrimination claim of unlawful discharge and disparate treatment. On the unlawful discharge, I have trouble getting anywhere with it. I mean, she says she's older than the person that replaced her. Maybe that's a prima facie case. But, gosh, she calls her boss this nasty name that specifically refers to his sex and whether it's behind his ---- But she denied saying that, didn't she? She did deny saying that. So that's a contrary fact. The issue with the unlawful discharge was that she denied saying it under the circumstances in which she was asserted to have said it. Wait a minute. There are a couple of levels here of denial. One is, I never called my boss that name. My impression is she doesn't exactly say, I never called my boss that name. She says, I didn't call my boss that name in that circumstance, time and place. Is that right? Yes. Okay, the next level I have is, let's say it's true. She never said that about her boss. But let's say the bank investigated the accusation and they reasonably concluded that she had. Wouldn't that still be a non-pretextual firing for calling her boss a bad name? But that would depend on whether there are other people who called names, and those people were indisciplined, right? That's correct. The problem here, Your Honor, with the question is the premise of the question, if the bank did this, the essence of this claim is that the bank didn't do that. The bank didn't ever investigate. The bank didn't allow her the opportunity to address the assertion. And that was a form of disparate treatment. So the unlawful discharge claim in and of itself is based upon disparity of treatment, even if she had used that language under those circumstances. I thought the other employees called him something that was nasty but sex neutral. No, pretty much the same thing. The use of the word, the sex part of the use of the word, I think, is she was alleged to have called him a fucking prick. Yes. There was evidence that other employees. Only one sex has those. But the other employees called him something that everybody has. Exactly. So, you know, if you want to get into that. But the problem, the problem again is to go back to the essence of this. This is a disparate treatment claim. And the unlawful discharge is premised on the disparity of treatment. So what happened to the failure to follow their own internal discipline procedures, is that what you're referring to? Yes. Premised by an entire series of months of disparate treatment. So in other words, we're not just looking here at the discharge itself. We're looking at the combination and culmination of some months of disparate treatment designed to essentially terminate this employee. I had trouble on the disparate treatment. The sex thing I didn't think was just a joke. I mean, if you use the female analogy, calling somebody by the female organ is a lot nastier than calling them by the shared organ. As a matter of law? A matter of the way ordinary people use the words, I think. Yeah, I think. There's one word we use, a lot of people use commonly, and there's another they don't. So I didn't mean that just as facetious. No, I understand. My other question is on the disparate treatment. The way I understood it, her branch went down in loans, her boss demanded regular reports and a plan for improvement that were not demanded of everyone else. The numbers went up, but then her branch failed an audit. It looked like there was reason to treat it differently from other branches. Well, we assert that the evidence that we produced showed that there wasn't reason, because here's what happened. The 22-year employee who had had exemplary performance for, throughout those years, the branch that she had was actually on top of the branches within the State of Washington at one point. What happens is there is a management shift change around 2001, and that management inherited a disproportionate number of older branch managers in the Spokane area. When you say a management change, are you referring to Firstar's acquisition of U.S. Bank? And Mr. Wilcox? That's more than a management. I mean, that's an ownership change. It's a completely new organization, right? It was a new organization, but most relevant for this is it produced a new series of managers in the Spokane area. But, I mean, everybody had to be reemployed by a new employer because it wasn't the old bank anymore. That's correct. But in the reemployment, the management essentially inherited a bank, a branch management set of employees. I think it was something like 9 out of 11 who were over the age of 40 and in their mid-50s. Five years later, that same branch management makeup is 8 out of 10 under the age of 40 and a number of them in their 20s. What we showed here was that the branch management industry is very, very volatile. You can have loan base shifts that went from a positive – I think we had an example here in the evidence of something like 1.9 million one week and a negative 700,000 in the same base the next week. It's a very volatile business, and that was acknowledged. What happened here is we claimed that in the process of reducing the age of the employees in this particular area, the Spokane area, as soon as Ms. Jones' loan base dropped in January and February of 2003, as soon as it dropped, the management came after her. They immediately gave her a written warning, which had never happened and did never happen with any of the younger managers. They required her to create an action plan. In other words, they gave her more work. They then required her to create a new action plan, because the first one wasn't good enough. They then gave her probation with these specific, very onerous financial requirements that no one else had ever met. And they gave her these different financial standards that were exorbitant. In other words, she was in 2003 on her probation required to produce 21 percent loan growth, whereas the 38-year-old manager up at North was producing 1 percent the same year. She was then given weekly monitoring by her supervisor and performance checks, never before heard of, never after heard of. She was then, once she completed that probation, which she did, that's where now we're going to say you failed an audit. Well, there was also evidence that other individuals had difficulty with audits and were not placed on probation. Ultimately, what you had is that she's then summarily fired without process. So we produced substantial evidence of disparate discipline. Now, here's what happened. Did other people have the decline in loans comparable to hers? Oh, yes. There was a huge amount of evidence produced about some really striking figures. And other managers like her had comparable declines in loans and comparably failed an audit without having the same impositions placed upon them or being fired? Substantially poorer performance, evidenced. In other words, she had this reduction that went on for a period of a couple of months. We showed evidence of younger branch managers. One of them here had a negative 38 percent loan growth in 2003. What about the comment of, I think it was Judge Van Sickle, he said something like, well, you haven't shown that those were in the same economic environment or something like that, right? Right. Can I – let me address the question this way. Because what happened is Judge Van Sickle created a couple of new definitions. He created a new definition of what constitutes disparate treatment. And he created a new definition of the substantially similar employee, which is what Your Honor is referring to. And let me tell you what happened to the law in the State of Washington very succinctly. The old definition of employment discrimination, disparate treatment, in Washington is less favorable treatment in the terms, conditions, and privileges of employment given similarly situated employees performing substantially equal work. And then the discriminatory encampment. So there's these three elements. Less favorable treatment in the terms, conditions, and privileges of employment. Here's the new definition. Less favorable treatment in the terms, conditions of employment. Rising to the level of adverse employment action. Rising to the level of adverse employment action that materially affects the terms and conditions of employment. And actually, Ms. Jones, because your showing of disparate discipline here still qualifies, even under that. Number four, adverse employment action that materially affects the terms and conditions of employment to the extent of altering job duties or impairing the ability to perform the job. Now, goodbye, because you can't show that anymore. Even dissimilar discipline is no longer disparate treatment because it doesn't materially alter the job. So you can no longer get there in the State of Washington. Now, this definition, this new definition created by Judge Van Sickle, is a violation of statutory construction concepts as well as precedent. I think we review this de novo, so it doesn't really matter if he made errors of law, does it? Well, what is the correct definition? I'm sorry. If you say his definition is wrong, what is the correct definition? Since 1985 in the State of Washington, carried through to 2006 in the recent supplemental authority that I gave you, the definition of disparate treatment in the State of Washington is very simply less favorable treatment in the terms, conditions and privileges of employment, period. Less favorable treatment. Without any requirement of, I'll tell you, substantiality of that treatment? There is no requirement of an adverse employment action. And this is an interesting point because one would think, well, doesn't it have to be material somehow? Wouldn't it have to be material? Wouldn't it have to do something? And the answer is not in the State of Washington and, frankly, not federally. The best way of looking at this is to look at the statutory language. The statutory language is very plain, very simple, and adding an adverse employment action requirement would be a violation of the plain language rule, which is you can't add in this element of adverse employment action. Various reasons why they don't think it was because of her, that it wasn't because of her age. What is there that rebutts that evidence against, that evidence for it being nonpretextual? The showing that we made, which is all we were required to do, doesn't matter what they say, literally, the showing that we made of discriminatory intent was, number one, the number of disparities that she underwent and the fact that no one else that you spit in your boss's eye, he's going to try to get rid of you. Even if you didn't mean to spit in his eye and you didn't spit in his eye, but he thinks you spat in his eye, he's going to try to get rid of you. But let's talk about the disparate treatment that occurred before that, okay? Because this is the problem with this case. Everyone's focusing ultimately on the discharge and saying, well, she swore to her boss she should go. You know what? Maybe that's true. But let's look at what happened before. I expect in a law firm, if you were to hear that some young associate of yours called you by a young male associate, by a nasty word that's used for part of the female anatomy that's analogous, and you thought that was true, that young male associate would be gone and it wouldn't be pretextual for discriminating by sex or age or anything. Well, I would disagree to the extent that if everybody in the office was calling you by that name and you singled out old Joe and fired him, then you've created a different name. I don't think there was any evidence that everybody called her by the same name, was there? What I'm saying is, if you have an entire office full of associates in your law firm that is calling an individual a nasty name, and you as the employer go to the black man, fire him for it, it doesn't matter that he called you the nasty name. What matters is that you treated him disparately. You subjected him to disparate discipline that others in the non-protected classes were not subject to. So this is the essence of employment discrimination. You can have, you know, ten people out there who are committing the same misconduct, who are committing the same poor performance, but if you as an employer go to that pool and you pick out the protected individual, the older person, the black person, the female. So if everybody calls me an SOB, but the black guy calls me a name that is somewhat nastier or refers to my race or religion in some way, I can't fire him. No. No, no, no. If everybody is calling you the same name, not the black guy calls you something nastier. If everybody is calling you the same name and you go pick out the black guy, then there's a presumption there that you're discriminating in your discipline. And that is the essence of employment discrimination. Employment discrimination law requires that employers treat similarly situated employees performing substantially equal work similarly. So if you're going to fire someone for calling you a nasty name, then an employer is motivated by State law to be darn sure that they're not simply picking out the protected employee, the woman, the black man, the whoever else, and saying I'm going to make an example of you, because that would be disparate treatment. And that is the essence of what we're dealing with here. This older employee was singled out for discipline with dropping performance long before the discharge ever started coming up on the horizon. This older employee was immediately focused on and was disciplined, given a more discipline. And it is that period of time here that is actionable as disparate treatment. We also allege that her firing was disparate because everyone else who was subject to some form of misconduct was at least given process. This woman was not even asked, did you say it? This went right to the top, and she was summarily discharged. What is your response to this, I think what Washington calls the same decision maker rule? The same rule. In other words, right? Isn't that what happened in this case? Well, no, that's not what happened in this case. What happened in this case is we got this new definition. But as kind of one of the ---- Wasn't the same decision maker? Yes. But this was sort of an ancillary, oh, and by the way, kind of a decision. This was really at the end of the decision, and it went something like this. You can't show discriminatory intent here anyway because it was the same actor. The same actor, however, is very, very different in its application than was used by the district court here. The same actor says if you have somebody that hires and fires within a very brief period of time, this is not evidence of, this is actually kind of an evidentiary showing, this is not going to be perceived as evidence of discriminatory intent because they're kind of protected. Well, we're not even at that stage yet. I mean, we're not even at the stage of what is the jury ultimately going to think or how is the jury going to be instructed. We're still at the stage of have we made a showing of disparate treatment? You mean that rule can't be considered on the summary judgment? Is that what you're saying? Well, I think it can be, but I think more classically it's a question of fact and it's an instruction of the jury. But here you don't have to. Doesn't it undermine the plaintiff's prima facie case? Isn't that how the same actor is treated in the Washington case law? No. Because here's the difference between this situation and your classic same actor. The same actor classically is Bob hires Gene and then Bob fires Gene two months later. Well, obviously Bob is not being discriminatory or we wouldn't have hired him in the first place. Well, I thought that was the theory here. Well, but here's what we have. Well, it is. But facts are very different. What we have here is Steve inherited all of these older employees in the transition. Now, did he have to? No, but he didn't have to. I don't think he had to keep them. Well, I would think that he did. And this is kind of an issue. Is that what the record shows, that he had to keep them? Well, you can't really show that. That's an inference. See, here's the thing. But he was the one who made the decision to keep her, was he not? He was the one that made the decision to keep all of the older employees at the start. He's the district manager. Right. Right. Okay. Was he also the same person who told her you're fired? Yes. Why isn't that the same actor? Because it was two years later. And because, as I've indicated in the brief, it would have been obvious if he had just come in in 2001 and he hired on this base of branch managers, 11 of whom were not hired, any of them, and put younger employees in, well, you would have had a massive age discrimination claim. It would have been overt, transparent, and right there. So what we are alleging here is that what he did is he systematically began eliminating and or moving the older managers over a period of five years to where, by 2005, you had a complete reversal of the age makeup. But where in the Washington cases does that say we treat the same actor doctrine differently? It's still the same actor. It is. But in interpreting it, I have about six seconds left. Go ahead and answer. In interpreting the same actor principle, you have to apply it differently based upon the facts that are before you. It's not a golden, if he hires, then he can't, and he fires, you can't have discrimination. That is not how that principle must be applied. It is a presumption that says if you have one guy who hires and then very shortly thereafter he fires, that is a piece of evidence that would refute discriminatory intent. I don't understand something. If he hires the over 40s, which is basically what happens at the transition, why doesn't that show that he hires over 40s? Because he was stuck with them is my summary answer. Why is he stuck with them? I mean, transition, he can say, okay, here's the deal. It's a new bank. Everybody apply for your job, and people are always going to have an advantage when they apply for a job if they have experience in the job. He can just open all the applications. People do that in transitions. I agree. But if he were then to say, okay, everybody reapply for the job, and he hires everybody that's 25 to 32. But that didn't happen. Then U.S. Bank's got a massive problem. But that didn't happen. Absolutely not, because discrimination is much more subtle. You're not going to do that as a bank. You're not going to say, by the way, we need a new look for our employees in the Spokane office. So, Wilcox, when they apply, we want you to hire all these people that are 25 to 30. That isn't going to happen in the real world. But are you arguing theory or are you arguing evidence? Because it seems to me that if it's the same actor that undermines the element that, which you have labeled as two, I guess, in your supplemental letter, of less favorable treatment involving similarly situated employees, because it's the same actor who is directing the treatment of the employee. And so the question is, what evidence did you have to refute the defense explanation that you hadn't made a prima facie showing under that element? Okay. Let me just say first, the same actor does not immunize an individual from being discriminatory. The fact that you have the same actor. I agree. But what I was hearing you saying, I was hearing you give your closing argument to the jury as to why it doesn't make any difference that it was the same actor who hired and fired her. What I want to know is, what evidence did you present to Judge Van Sickle that suggested that he couldn't rely on the same actor doctrine in determining that you hadn't made out a prima facie claim on summary? The evidence that we presented that the same actor principle was not and could not be determinative on a summary judgment here was the litany of evidence of how this same actor, after hiring Ms. Jones, began treating her discreetly, effective January 1st of 2003, in all terms of discipline, financial performance, the various categories that we showed, that this same actor may well have been the same actor, but this individual began treating Ms. Jones overtly or disparately. If I understood, I'm not sure I understand, but if I understood this right, the argument is, even though he hired all the over 40s, he was still planning to discriminate against them. It's just he was sneaky, didn't want to be the butt of a lawsuit. So he had this sneaky plan to fire them over a period of a few years. But no evidence that that was what he was doing, except that a few years later, the bank has mostly under 40s, which means that the other over 40s also got let go, and it undermines the idea that she was treated worse. Now, what often happens in a transition is the old people don't like the new bosses, and there's friction, and eventually a lot of people go. I'm not sure I get what undermines that theory, why that's any more speculative than your theory. What we showed here as evidence was we showed not only the pattern of age reduction, but we also showed very similar, the very similar disparate treatment being given to a woman branch manager who was 52. Her name was Kathy Krosky. And she was subject to the very same pattern of the management jumping on her as soon as the base started to drop, putting her on probation, subjecting her to onerous financial requirements, and then firing her. So we showed not only the pattern of age reduction, we also showed another older branch manager who was subject to the same form of conduct, and we showed the numerous disparities. She worked for the same person? Yes. She was in the very same Spokane area. And we then showed the very number of disparities that Ms. Jones herself underwent that no other younger branch managers went through. So we showed not only disparities, but patterns of conduct. Thank you, counsel. Thank you, Your Honors. Good morning, Your Honors. Julie Lucht on behalf of U.S. Bank. I'd like to make a couple of corrections to begin with. First of all, there's no evidence in the record that management was aware of any other employee making this type of profane, defamatory comment about a supervisor. The only comparator that the appellant has offered with respect to the discharge is Mr. Mark Butera, who suffered from a written disciplinary action for failing to follow bank policies when insurance applications were processed. Nothing to do with profane language, nothing to do with gross insubordination. There's no one offered as a comparator with respect to that termination conduct. I thought there was evidence that everybody called this division director nasty names, albeit a different one. No, Your Honor. There was evidence by a person in a different department that she had called Mr. Wilcox an asshole at times, but not that that had been reported to human resources. In this case, Ms. Jones was the branch manager, the highest-level person in that branch, and her assistant manager, second-in-command, who was older than she, called human resources and reported this conduct, which was then investigated. What about these ñ there's lots of representation in the plaintiff's statement of material facts, but most of them refer back to the Baracko deposition that say, for instance, here's one here, 142. Every person who works under Steve Wilcox has probably said that to their people, that meaning that, you know, he's a fucking asshole. So Ms. Baracko was in the operations department, not in the branch management and the sales chain that Mr. Wilcox was in. And that was her personal opinion that because of who Mr. Wilcox was, she thought that probably everybody under him had called him that. There was no evidence that it was ever reported to management, that anyone ever raised this as an issue. It was just her opinion as a former U.S. bank employee that that had occurred. Did she say she'd heard it, or did she just speculate? I believe she said that probably had happened. And I believe that she said she may have called him that. But, again, she was a peer of his. She was not someone that reported to him. And she was, you know, again, this was mostly hearsay and speculative testimony. What about the putting these things together, this part of the plaintiff's assertions? One, whatever it's called, there's nothing in the employee's handbook or something like that that, you know, has a rule against using this type of language. It was not used in front of customers. And, number two, there's some kind of process set forth in the handbook that's supposed to be given to the employees, and none was given to Jones. I don't believe there was any argument or sincere argument that this was not bad conduct, that calling your boss. Well, is it true that there's nothing in the handbook that prohibits that kind of name calling? There's nothing in the handbook that says you can't, you know, you can't use the word fucking prick in the workplace. But there is in the handbook. There's discussion of insubordination and appropriate conduct. There's a sexual harassment and EEO policy. Ms. Jones, as a branch manager, was well aware of all those four rules. Now, what about, you know, the disciplinary process that's supposed to be offered people? Well, the disciplinary process is that at times, such as when someone commits what's found to be and believed by the bank to be in their discretion a minor infraction, the bank will use a written warning or a verbal counseling. But when there's a ---- Doesn't it apply to major infractions, just a minor? No, Your Honor. No, not where there's a case like this where somebody has been grossly insubordinate, calling to her subordinates, the employees in the branch who ultimately report up to Mr. Wilcox, calling him a fucking asshole or a fucking prick, excuse me, in the workplace. Never thought I'd be saying that in court. But ---- One may be sexual harassment and the other may not be. Excuse me? One may be sexual harassment and the other may not be. Exactly. So there's certainly the workplace rules prohibit it. Certainly the bank was entitled under the law to hold its managers to a higher standard. So even if other employees in the workplace had been calling him an asshole, she was the head of that branch and she can be held to a higher ---- she's supposed to be the role model for those employees and she can be held to a higher standard. Which means, though, that in management's view, she's not entitled to, you know, say a warning or anything like that. It's just summary termination is okay. For that type of offense, yes. Your Honor, for poor performance, she was placed on a performance improvement plan. She finished it. She went on. For a failed bank audit, and I also am not aware of any evidence in the record that there were other managers who failed bank audits and were not placed on a performance improvement plan. I don't believe that's in the record at any point. There's no evidence in the record that it wasn't the routine response of the bank to place the supervisors of branches that failed audits onto performance improvement plans. However, and again, other managers who engaged in lesser-type conduct wouldn't be summarily terminated. But this was ---- and this was a case where Mr. Rob Schapitka, her direct supervisor, when interviewed at Branch Employees, he reported back to Mr. Wilcox that he believed that this conduct had occurred in addition to a number of other inappropriate workplace conducts. And that was reported up to Mr. Wilcox's boss, who incidentally was about 58 at the time, and Mr. Wigrin's, Mr. Wilcox's boss's boss, who was 53 at the time, I believe, and approved by HR, who was about 53 at the time. And this was all regarding Ms. Jones, who was 45 at the time's termination. So what are you saying? Well, or maybe this is one of the things you're saying is this was kind of a collective decision amongst all those people you mentioned, or at least they all approved it? Yes, Your Honor. And what did they do in the end? They told Wilcox, well, go ahead and carry it out or something like that? Yes, Mr. Schapitka, who was Ms. Jones' direct supervisor, and Mr. Wilcox met with Ms. Jones, explained what they had found, and terminated her employment. But was Wilcox the one? Did he have the authority to terminate Jones on his own? No. That would require human resources approval, and normally upper bank management approval for branch manager termination. So he had to at least get the approval of human resources. Yes. What does that do to the ñ I think I understand what you said. What does that do to the same actor? I mean, it really isn't in the sense that it's like a committee consensus before they can actually let her go. Well, the person accused in the complaint and throughout this lawsuit is Mr. Wilcox. Mr. Wilcox had the idea, yet he is the same actor. And if you take a look at the Hill case, which is a Washington Supreme Court case, it's absolutely clear that Washington has adopted the same actor inference, and that's what needs to be applied. In both the Hill case and the Griffith case, which is a Washington appellate court case, there were differences in the actors. There was, in the Hill case, two employees participated in the termination, even though one employee had been the hiring person, and the same actor inference applied. And also there was a reference about this lapse in time. It was less than two years in this case. The cases don't really discuss the reality, particularly in large organizations like U.S. Bank, that an individual manager really doesn't have the authority to fire a branch manager on his own. I suppose if he caught the branch manager in a, you know, defalcation or something, or with a hand in the till, that he might be able to fire him on the spot. But I suspect even then you'd probably put him on administrative leave and conduct some kind of an investigation before you terminate him. Well, I think the important thing to consider is the effect of the same actor is a presumption that that individual doesn't have a discriminatory animus. So whether or not Mr. Wilcox was allowed to terminate Ms. Jones on his own or not doesn't make a difference with the same actor inference because he's the one accused of the discriminatory action and conduct in the discriminatory animus. And so if he... He's sort of the moving force. In other words, if he didn't initiate the termination process, no one else would have thought about it, right? It was his... Well... He initiated the termination. He went to HR and his vice president and said, I think this woman should be fired or something like that. Well, the... It was... His report investigated it, reported back, and they concluded that she should be terminated for this conduct. And then it was... The approval was sought and there was a... I believe the record shows there was a conference regarding the conduct. And the highest level manager at the bank found it totally inappropriate and unacceptable that a manager at the U.S. Bank would say something like that. And it went forward. But, again, Mr. Wilcox is the only one accused of having some type of age animus. And, you know, the other actors were considerably older, so that may be one of the reasons that he's the only one accused. And he is the one that the same-actor inference should apply to. So, basically, that would defeat this presumption. What it does is it creates an inference that he did not have an age bias. And it increases the plaintiff's burden of proof to overcome that, and the plaintiff didn't do that here. And I want to say a couple words about the merger and how that impacted the same-actor inference. This was a... The plaintiff's testimony is in the record that she had to reapply for her job, re-interview for her job, and then be placed back in her job. And she was, in fact, one of the few people that stayed in the same branch. A lot of others did change in the merger. And so there's no reason that the same-actor inference shouldn't apply in this circumstance. In Griffith, it was the same type of... So she did have to reapply for a job. She did. And this fellow, Wilcox, rehired her. Right. And, in fact, in Griffith, it talks about how when the person's rehired, it's even in stronger inference that they don't have the animus. I also wanted to make a couple of... How old was Wilcox when he rehired her, incidentally? He's a year younger than Ms. Jones, so I'm not sure. I think she was 43, and so he would have been 42 then. And she was 45 when she was fired, and he would have been 44 then. I'm not sure exactly the months or days. That's close enough. Now, the the with the with respect to the performance improvement plan, and the procedural history of this case is the complaint reads, and it's been litigated as the allegations with respect to the performance improvement plan were simply evidence that there was this intent to get rid of Ms. Jones, and that supported a termination case. And so we move for summary judgment, and then Ms. Jones moved to amend her complaint to include a separate case for disparate treatment outside of the termination context. And that's what got dealt with on the motion. Let's assume for purposes of discussion that no adverse employment action is necessary for her disparate treatment claim. So she says, I was treated differently. My conditions at the workplace were more onerous just because of my age. You can tell because people younger than me who also had declines in productivity and failed audits were not required to jump through all these hoops. Now, what is the answer to that if it turns out that the law supports the notion that there doesn't have to be an adverse employment action? Even if there were no adverse employment requirement in Washington, which there is, then she still was subject to summary judgment because she has not, again, the same actor influence applies, because she's accusing Steve Wilcox of directing these onerous requirements. And the similarly situated alleged comparators are just not similarly situated in this context. She is sort of cherry-picking the numbers through two years of bank performance and picking out specific individuals. And in the briefs, we discuss each one and why that person is not in the same circumstance as Ms. Jones was when she was on a performance improvement plan, which, although it's alleged to be so onerous, she was able to successfully complete. The other branch managers are looked at in the end of 2004 instead of the beginning of 2003. And that end also, it's alleged by the plaintiff that all of the branch managers under Mr. Wilcox were doing horribly. And if that were the case, if you have a car salesman and in one year everybody sold 100 cars, but this guy and he only sold 50, well, it might make sense to get on his back and ask him to do a better job. But if in the next year everybody only sold 50 cars, that's not evidence that he was treated poorly the year before when he was hassled for only selling 50 cars. You have to have the same type of conditions. And here, because of the accounting changes, because of the changes in interest, because of the fluctuations in the market, if everybody's performance goes down, it's just not reasonable to infer some sort of discrimination because not everybody was placed on a performance action plan a year and a half later. And there are specific issues with respect to the specific individuals called out, such as one wasn't in the same job, one had only been in the job for a couple of months, others, you know, were splitting up the year and the whole year was attributed to them. There's a number of reasons why the numbers that are called out are not applicable. And if you look at those comparators, they're just not similarly situated. So even in the – even if there was – even if you could state a claim for merely being placed on a performance improvement plan without any impact on your pay, without any impact on your ability to be promoted, without any material change in the terms and conditions of your employment, then she still hasn't – hasn't stated the case because she can't – a reasonable jury couldn't find that the reason that she was placed on this performance improvement plan, when admittedly she had lost a huge amount in her loan base, was age-related, because the only comparators she's found has put forward are way – are remote in time. And tellingly, none of the individuals at the time when she was placed, or even in that same year, are called out as having been treated favorably. It's just the individuals a long time later that are called out as alleged comparators. And what is the best authority for some adverse employment action being needed in Washington? I saw the 28J letter that says the Washington Intermediate Appellate Court says otherwise. I haven't read that case yet. What's the best authority? The letter just came in yesterday, and it cites cases that were recited in our response brief, so I don't think that it's really supplemental authority. Okay. What's the best authority for – But Kirby – the Kirby case, it's a Washington Appellate Court case. In connection with the McLarty v. Totem case, which is a Washington Supreme Court case decided shortly after Judge Van Sickle's decision in this case. And it undermines that Washington – in the McLarty case, the Washington Supreme Court adopted the federal standard of – for disability definition. And importantly, it mentioned that one of the reasons it did so was because failure to do so would trivialize discrimination claims. And that's exactly what would happen if we dropped the adverse employment action  here. We'd have a bunch of trivial claims that could make it to court, because if somebody has an office that they think is not as sunny or an office that they think is not, you know, as near to the bathroom, well, it's a difference in treatment, they could state a claim under the standard being advanced by the appellant here. But Kirby and reinforced by the McLarty decision are the best authority, in my opinion, for – I need a 30-second recess. Okay. Sorry. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. How are you doing? Oh, okay. Sorry. I can't quite get your momentum there. I know you're a minute and a half past it. I think you just have to wait. Do you have some ice cream or something? I think so. Thank you. Okay. All rise. Sorry for the interruption, counsel. And one final point with respect to the adverse employment action requirement, which has been recognized in Federal case law over and over again, is that it would obviate the need for a hostile work environment claim if there was no adverse employment action required or at least some material impact on terms and conditions of employment to state a disparate treatment claim, because any type of looking at somebody the wrong way, any type of different treatment would be recognized as actionable, whereas the hostile work environment is clearly laid out with certain standards to meet. And so as has occurred in Federal law, it makes sense and has been applied in Kirby and Washington that there is a distinct disparate treatment claim and it requires an adverse employment action. And if you don't want to proceed on those grounds, you need to show a hostile work environment based on whatever protected status that you're claiming to be discriminatory. The Marquis case that's relied upon by the appellant here, there was never an issue with respect to that. Kennedy. So if you give all the women windowless offices and all the men offices with windows, you proceed under this different theory of hostile environment? Right. If it rose to the level where it's impacted the terms and conditions of their employment, then they can sue about it. But so long as it's just different offices, it's not actionable under the law. And that standard has been tenable under Federal law. There are a couple arguments about the or and then privileges won't be protected under the age discrimination statute, but the ADEA has the same privileges language and the adverse employment action has been required under the ADEA and Federal law, and so has the adverse. And that standard has not been a problem for Federal courts to apply. You were about to say something about the Marquis or the Marquis case? The Marquis case is a Washington Supreme Court case relied on by the appellants. But in that case, it was a golf professional, a woman, who was suing because her contract hadn't been renewed and that the terms of her contract, including her pay, were less than the other three men golf professionals. So there, there was no question that there was an adverse employment action because the whole case was about failure to renew the contract or the difference in compensation, which is a, by definition, actionable in the State of Washington. The other key point about Marquis is that because it was a sex discrimination case and because Washington has a constitutional protection for prohibiting discrimination between men and women, it's – there is a slightly different standard under Marquis. And they talk about how they normally do follow Federal case law. There are some instances where they won't, and that, that would be one type of one where there would be a different standard because of the constitutional protection. Otherwise, there is a wealth of Washington law, and most recently in the McLarty Washington Supreme Court case, where Washington has made it clear it will follow Federal law for comparable statutes which have the same purpose, which is we have almost exactly the same language here. But it doesn't refer – that case doesn't refer specifically to the adverse employment action, though? No, it doesn't discuss it, and the – But it says generally follow Federal law. Generally. There's two parts to that case, and one piece is about the sex discrimination and what the standard should be under that. And that also brings me to the – the reliance on retaliation cases. The third case cited in the Supplemental Authorities letter of yesterday, the Wray v. Henderson case, is a retaliation case. There is a different standard since the White v. Burlington Northern Supreme Court case. There's a different standard for retaliation than there is for the underlying discrimination, the substantive discrimination claim. And so any cases that are applying a retaliation standard are just not going to be applicable here as they wouldn't in a Federal case that was just alleging the underlying discrimination. Thank you, counsel. Thank you, Your Honor. Counsel, your time was all consumed, but go ahead and take one minute for rebuttal if you need it. I just want to make three very brief points. Number one is, if the Court is going to import a new element, this adverse employment action rising to the level of whatever, if the Court is going to do that or other than that. Before you go there, what's your best case that Washington does not have an adverse employment action requirement? Shannon v. Pansave since 1985, all the way through to the case I just cited yesterday, which is Clark v. the Attorney General's office. All of them break disparate treatment down into three elements. Less favorable treatment given to a protected employee. Defining what less favorable is. That's correct. And what I'm saying is, if there are less favorable treatment, there is an intent to import this adverse employment requirement into that statute. That needs to be done by the legislature or it needs to be done by the Washington State Supreme Court, which so far has not done that. Secondly, on that same issue, you cannot properly import that element into that statute because it would take away the explicit right to bring a claim for disparate privileges. The lack of having a privilege that someone else has is not necessarily adverse to you. It doesn't materially affect your terms and conditions of employment. It's simply giving others more privileges. So you would literally remove that explicit statutory claim for disparate treatment. And third, on the same actor issue, what we showed, the evidence here that was produced was disparate treatment in probation and financial requirements by the same actor culminating in a disparate termination of an employee, i.e., one without any process, recommended by the same actor. And so the question becomes, did we produce sufficient evidence to show less favorable treatment by the same actor sufficient to rebut that inference of immunity? And my argument here is that we did, because we demonstrated the very specific disparities occurring by that person who was the same actor. On that termination claim, I'd like to respond to a couple of questions that were brought up by your opponent. One, her position is that, well, none of these so-called instances or beliefs about, you know, other employees using bad language was brought to the attention of management. There's no evidence of that, number one. And then number two, there aren't any instances cited in any event that involve a manager making those statements. What's your response to those two arguments? Number one, there was no evidence that this name-calling had been brought to the attention of upper-level management because no one ever did an investigation, which was the disparity. Secondly, and I'm sorry, Your Honor, I forgot your last. Well, but none of those other people who used that kind of language were managers. Oh, were managers. Yeah. Actually, they were. Ms. Baracco was one of the senior management. Ms. Baracco actually had been Ms. Jones's prior manager in the position that Mr. Wilcox took over. And Ms. Baracco used that language, and Ms. Baracco indicated that others used that language. And the disparity that occurred to Ms. Jones is that Ms. Baracco was on the same level as Wilcox. Yes, she was. She was actually moved out when Mr. Wilcox came in vertically. She was moved over here. So she's not in subordination by her. Pardon me? So it's not in subordination by her. No. Her testimony was that everyone was using the same language. Did you say she heard other people use it, or just she supposed they did? You know, Your Honor, my recollection is, and I think that there's record sites on this in the brief, my recollection is that she was specific, that she said everyone refers to Mr. Wilcox, not I believe everyone, not I think everyone, but everyone calls him X. And again, the the X being the non-sexually specific guy. Yeah, but now remember also, Your Honor, and this is I think something I missed before, remember also in this sexual angle of this, Ms. Jones denied using that sexual term. I mean, they never asked her, which is the disparity, but she denied using that sexual term. She said, no, I referred to him generically as the. Well, she basically says that's not something I would say, right? She said that she did not use, she would not use that language under those conditions. Yeah, but no one ever went to her and asked, and that's, again, what we say is, you know, this is evidence of an intent to sort of run her out the door in the first place. Thank you, Your Honor. Thank you, counsel. Ms. Jones v. U.S. Bank is submitted for adjournment for the day. All rise. The support for this session stands adjourned.
judges: Kleinfeld, Tashima, Tallman